FILED

10/25/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0050

DA 16-0050

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2016 MT 267

MISSOULA ELECTRIC COOPERATIVE,

      Petitioner and Appellant,

    v.

JON CRUSON, INC.,

      Respondent and Appellee.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DV-15-407
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          David B. Cotner, Anna C. Conley, Contract Attorney, Datsopoulos, MacDonald & Lind P.C., Missoula, Montana

          Edward "Rusty" Murphy, Murphy Law Offices, PLLC, Missoula, Montana

      For Appellee:

          David C. Berkoff, Berkoff Law Firm, P.C., Missoula, Montana

          Nate McConnell, McConnell Law Office, P.C., Missoula, Montana

      Submitted on Briefs:  September 14, 2016

      Decided:  October 25, 2016

Filed:

                                 Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Missoula Electric Cooperative (MEC) appeals the order of the Fourth Judicial District Court, Missoula County, affirming the Human Rights Commission's (Commission) decision to reverse its Hearing Examiner's grant of summary judgment to MEC on the age discrimination claim filed by Appellee Jon G. Cruson. We restate the issue as follows:

¶2 *Did the Human Rights Commission err by determining that the Hearing Examiner improperly granted summary judgment to MEC?*

¶3 We affirm the Commission's decision and remand this matter to the Hearing Examiner for further proceedings. The facts cited below are drawn from the record as it exists for summary judgment purposes.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 In 2011, MEC and the International Brotherhood of Electrical Workers Local Union 44 (Union), as authorized by their collective bargaining agreement (CBA), entered into an Apprenticeship Standards for Electrical Lineman Agreement (Agreement), which was in full force and effect at all times relevant to this litigation. The Agreement governed the selection and training of apprentice linemen, and the administration of the apprenticeship program, for the Union, MEC, and MEC's employees. The Agreement created the Joint Apprentice Training Committee (JATC), which is the entity responsible for selecting and training apprentice linemen. As provided in the Agreement and CBA, the JATC is composed of four people, two selected by MEC and two selected by the Union.

2

¶5 The JATC, as established by MEC and the Union, is responsible for screening, recommending, and training apprentice linemen. Prospective linemen for each apprenticeship are interviewed by the JATC, which recommends a candidate for MEC's approval. Approved candidates then receive training by the JATC. If a candidate is not approved by MEC, then the JATC begins the process again to select and present another candidate. The Agreement and the CBA grant to the JATC duties in the process of selecting and training linemen that are to be exercised independently from the Union and MEC.[1]

¶6 Cruson was employed by MEC as a Master Electrician from 2001 until 2013. In 2012, MEC created a new apprentice lineman position. Cruson applied for this position and was interviewed by the JATC, along with other applicants. At the time, all of the JATC members were supervisory or managerial level MEC employees, including: 1) an Area Foreman; 2) the Operations Manager; 3) the Manager of Engineering; and 4) a Crew Foreman. Cindy Woods, an employee of MEC, also attended and participated in the interviews. An agency investigative report described Woods as the "payroll/benefits administrator" for MEC, and Mark Hayden, MEC's General Manager, described Woods, in his deposition, as "the HR person for MEC." Upon completion of its interview

---

[1] The Agreement provided that the JATC would "[e]*nsure that the employer* provides the Apprentices with reasonably continuous employment and training during the term of the Apprenticeship, including diversified training in all major work experience of the trade." It provided that JATC would "[e]nsure that [the] Apprenticeship standards are kept up-to-date and that the Standards meet the requirements of the trade at all times and to supervise the enforcement of all provisions of the standards. The employer may modify these standards at any time *by the recommendation of* [*the JATC*]." Lastly, it also provided that "[t]he JATC will have full authority to supervise the enforcement of these Standards. Its decision will be *final and binding on the employer, the sponsor, and the apprentice. . . .*" (Emphasis added.)

3

process, the JATC selected another individual as its first choice for the apprenticeship and made this recommendation to MEC, while Cruson and two other employees, of similar age, were ranked in a three-way tie for second place. MEC did not approve the candidate recommended by the JATC, and no one was initially hired for the position.

¶7 Cruson inquired and was informed by Hayden that there were no qualified candidates for the position. Cruson, along with the two other employees, in the three-way tie, lodged a grievance with the Union, asserting age discrimination in the hiring process. The discrimination claims were based on statements allegedly made by members of the JATC expressing negative views about hiring older candidates. One member remarked that an older candidate's application "was a waste of [his] time," and that the older candidate "should have applied for [the position] years ago when [he] was younger." A second member said he "would never hire an apprentice lineman who was older" because he would not get his "money's worth out of [the apprentice] for all that training," or other words to that effect. The Union did not pursue a grievance over the matter, and Cruson and the other two candidates filed complaints against MEC with the Montana Human Rights Bureau, alleging age discrimination.

¶8 A Human Rights Bureau Investigator issued "reasonable cause findings" in favor of Cruson and Greg Flesch, one of the other older candidates. After the findings were issued, MEC ordered the JATC to reconvene and recommend either Cruson or Flesch for the apprenticeship position. The JATC selected Cruson and MEC offered him the position. However, Cruson declined the offer, claiming MEC's management had stated

he would not be supported by management or the other linemen, and instead elected to continue to pursue his age discrimination complaint, naming only MEC.

¶9 In the proceeding, MEC moved for summary judgment on the claim, arguing that the JATC, whose members' statements formed the basis of Cruson's claim, was not an agent of MEC, but a separate and independent entity over which it had no control. The Hearing Examiner granted MEC's motion, noting the JATC acted independently of MEC and "[t]here is no material and substantial evidence that [the] JATC was an agent of MEC[]. Cruson did not make any claims against [the] JATC. As a matter of law, Cruson cannot prove a case against MEC. His complaint must be dismissed in its entirety."

¶10 Cruson appealed to the Commission, which overturned its Hearing Examiner's decision, concluding the "facts presented by the hearings officer in the Order do not support the legal conclusion that there is no agency relationship between [MEC] and the [JATC]." The Commission's order remanded the matter to the Hearing Examiner for further proceedings.

¶11 MEC appealed to the District Court, which held the Commission properly reversed the Hearing Examiner's decision because Cruson had presented evidence creating a genuine issue of material fact about whether the JATC was acting as an agent of MEC.

¶12 MEC appeals.

## STANDARDS OF REVIEW

¶13 An agency's conclusions of law are reviewed to determine if they are correct. This same standard of review is applicable to both the district court's review of the

5

administrative decision and our subsequent review of the district court's decision. *Pennaco Energy, Inc. v. Mont. Bd. of Envtl. Review*, 2008 MT 425, ¶ 18, 347 Mont. 415, 199 P.3d 191 (citing *Indian Health Bd. v. Mont. Dep't of Labor*, 2008 MT 48, ¶ 11, 341 Mont. 411, 177 P.3d 1029).

¶14 The standard of review for agency decisions under the Montana Administrative Procedures Act, in relevant part, states: "The court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. . . ." Section 2-4-704(2), MCA; *Hofer v. Mont. Dep't of Pub. Health and Human Servs.*, 2005 MT 302, ¶ 12, 329 Mont. 368, 124 P.3d 1098.

¶15 Here, we examine the Commission's reversal of the Hearing Examiner's granting of summary judgment. We consider summary judgment pursuant to M. R. Civ. P. 56, and review the Commission's final agency decision *de novo*. Summary judgment is an extreme remedy that should be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Hajenga v. Schwein*, 2007 MT 80, ¶ 11, 336 Mont. 507, 155 P.3d 1241 (citing *Lee v. USAA Cas. Ins. Co.*, 2001 MT 59, ¶ 25, 304 Mont. 356, 22 P.3d 631). Under Rule 56, an agency should render a judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." M. R. Civ. P. 56(c)(3); *Roe v. City of Missoula*, 2009 MT 417, ¶ 14, 354 Mont. 1, 221 P.3d 1200 (citing *Corporate Air v.*

*Edwards Jet Ctr.*, 2008 MT 283, ¶ 24, 345 Mont. 336, 190 P.3d 1111). The party moving for summary judgment has the initial burden of establishing both the absence of genuine issues of material fact and entitlement to judgment as a matter of law. *Roe*, ¶ 14 (citing *Corporate Air*, ¶ 25). If the moving party meets this burden, then the burden shifts to the nonmoving party to establish that a genuine issue of material fact does exist. *Roe*, ¶ 14 (citing *Corporate Air*, ¶ 25).

## DISCUSSION

¶16 *Did the Commission err by determining that the Hearing Examiner improperly granted summary judgment to MEC?*

¶17 MEC argues that MEC and the JATC operate independently of each other and there is no agency relationship between the two. MEC argues the lack of evidence to the contrary requires a determination that summary judgment on the claim was properly entered. Cruson answers that an agency relationship exists because MEC conferred authority to the JATC to conduct candidate selection and training for the benefit of MEC and, further, MEC exerted actual control over the JATC. Cruson argues his age discrimination complaint is properly filed against MEC because it is the principal in an agency relationship with the JATC.

¶18 During the Commission hearing, Commissioner Sheri Sprigg listed several facts that could support an agency relationship between MEC and the JATC, including: 1) the JATC was created by MEC; 2) the JATC had no purpose other than to review applications for MEC; 3) all JATC members were MEC employees; 4) the JATC had no assets or staff of its own; 5) MEC's human resource person participated in meetings of

the JATC; 6) the JATC was known by MEC employees as "the hiring committee"; and 7) MEC reconvened the JATC to conduct a follow-up selection meeting.

¶19 Apprenticeship agreements are the product of statute and are generally governed by Title 39, chapter 6, MCA. Apprenticeship agreements are "a written agreement between an employer or an association of employers and an organization of employees describing conditions of employment for apprentices." Section 39-6-105(1)(b), MCA. The Agreement in this case was entered between MEC and the Union. It authorized the creation of a joint apprenticeship training committee and outlined the general powers and duties of the JATC:

> The Joint Apprenticeship and Training Committee established under these Standards shall be the sole administrative body for the apprenticeship and training program outlined in these Standards. The Committee shall have full authority and responsibility to install, regulate, supervise, control and operate the apprenticeship program and shall have complete authority to establish and enforce rules and requirements governing the qualifications, education, training, selection, and supervision of apprentices.

¶20 Many of the factual assertions offered by Cruson as indicative of an agency relationship are nothing more than inherent characteristics of the typical structure and organization of a joint apprenticeship committee, as the Hearing Examiner correctly reasoned. While MEC had a hand in "creating" the JATC at issue here, MEC's involvement was not unilateral. The JATC was created only after joint action by MEC in cooperation with the Union, pursuant to the CBA. The fact that the JATC was referred to as "the hiring committee" or as the "MEC JATC" is mere nomenclature or slang and provides no material evidence of an agency relationship. The assertion that the JATC

8

"worked for" MEC or had no other purpose than to screen applicants for MEC contradicts the Agreement and the CBA, which clearly demonstrate the JATC was designed to serve MEC, the Union, and employees seeking to advance their careers by entering the apprenticeship program. Indeed, as noted by the Hearing Examiner, under the governing agreements, MEC did not have control over which candidates would be recommended for apprenticeship positions. That all members of the JATC were employees of MEC and that they all held supervisory positions are, likewise, functions of the governing agreements: the JATC provides services for employees of MEC, and the people serving on the JATC are selected by MEC's management and the Union. If Cruson did not like who was selected by the Union to serve on the JATC, he should have taken that up with the Union.

¶21    However, there are several factual assertions which, when taken together, could demonstrate that, despite the governing agreements, MEC was exercising influence over the JATC in a way indicative of an agency relationship that would preclude summary judgment on the issue. First, Woods, a human resources representative of MEC, participated in the interviews and the applicant scoring process. Although Woods' scoring of the applicants apparently was not included in the JATC's final totals, her presence and participation signified an enhanced influence over the process by MEC not contemplated by the governing agreements. Because of a doctor's appointment, Woods did not also participate in the JATC's final selection meeting, about which Hayden stated in his deposition that "[Woods] had a doctor's appointment, couldn't attend, but I wanted

9

to get [the selection] meeting in before [Labor Day Weekend]." Hayden's statement itself provides an indication that MEC was exercising influence over at least the timing of the JATC's selection process.

¶22 Second, after the "reasonable cause findings" were issued by the Human Rights Bureau Investigator, MEC ordered the JATC to reconvene and select either Cruson or Flesch for the open apprenticeship. Flesch testified, in his deposition, that normally when the JATC's recommended apprentice candidate was not approved, then the position was reopened and the process began anew. However, here MEC ordered the JATC to choose either Cruson or Flesch, two of the three individuals who had tied for second place during the initial interview process. This conclusion is supported by the deposition testimony of Nick Labbe, a JATC committee member. Labbe testified the sole purpose for reconvening the JATC was to make a selection between Cruson and Flesch, and no other candidates were considered. Finally, the record indicates that it had been made known to the JATC that Cruson was MEC's preferred candidate, influencing his ultimate selection by the JATC.

¶23 Summary judgment "is an extreme remedy that should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Hajenga*, ¶ 11 (citing *Lee*, ¶ 25). While we take no position on the merits of Cruson's claim, we agree with the Commission that for purposes of summary judgment, Cruson has met his burden to demonstrate issues of material fact about his contention that MEC was exerting control over the JATC such that the JATC was acting

10

as MEC's agent. Consequently, the Commission did not err in reversing the entry of summary judgment, and remanding this matter for further proceedings on Cruson's claim.[2] The District Court correctly affirmed the Commission.

¶24 Affirmed and remanded to the Hearing Examiner for further proceedings consistent with this opinion.

/S/ JIM RICE

We Concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ PATRICIA COTTER

---

[2] MEC also offers an argument that the District Court erred by citing to an order entered by a District Court in a related case. We did not consider this citation in reaching our decision, and thus the issue is moot.