FILED

08/12/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0552

DA 24-0552

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 180

VICTORY INSURANCE COMPANY,

        Petitioner and Appellant,

    v.

STATE OF MONTANA, COMMISSIONER
OF SECURITIES & INSURANCE, OFFICE
OF THE MONTANA STATE AUDITOR,

        Respondents and Appellees.

APPEAL FROM:    District Court of the First Judicial District,
                In and For the County of Lewis and Clark, Cause No. DV 2023-0774
                Honorable Michael F. McMahon, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Linda M. Deola, Scott L. Peterson, Morrison Sherwood Wilson Deola,
                PLLP, Helena, Montana

        For Appellees:

                Kirsten Madsen, Legal Counsel, Montana State Auditor, Helena,
                Montana

                Matthew T. Cochenour, Cochenour Law Office, PLLC, Helena,
                Montana

                          Submitted on Briefs:  June 25, 2025

                                  Decided:  August 12, 2025

Filed:

                        _____
                                  Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1      Victory Insurance Company ("Victory") appeals from the First Judicial District Court, Lewis & Clark County's August 27, 2024 Judicial Review Petition Order affirming the Commissioner of Securities & Insurance, Montana State Auditor's ("CSI") decision to impose a $250,000 fine with $150,000 suspended for Victory's violations of the Montana insurance code.

¶2      We restate the issues on appeal as follows:

*Issue 1: Whether the Hearing Examiner improperly granted summary judgment in favor of the CSI on the question of whether Victory violated Montana's insurance code.*

*Issue 2: Whether the CSI violated Victory's due process rights when it imposed the fine.*

*Issue 3: Whether Victory was entitled to a jury trial.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3      Victory is a Montana property and casualty insurer.  In 2019, Victory issued workers' compensation insurance policies to several Montana businesses.  On or about April 1, 2019, Victory entered into an agreement with Clear Spring Property and Casualty Company ("Clear Spring"), pursuant to which Clear Spring agreed to reinsure all of the policies at issue in this case.

¶4      In late 2019, Victory and Clear Spring agreed that Victory would sell its book of business to Clear Spring, including the workers' compensation policies at issue in this case. Victory asserts that it called each of the insured companies around the time it entered into this agreement to notify them of the sale.  On December 31, 2019, Victory sent an email to

the insured companies stating, in relevant part: "To further reduce your business' workers' compensation premiums while increasing coverage options, effective January 1, 2020, your Victory Insurance Company policy has been upgraded to Clear Spring policy number [number]." This was the first and only written communication to Victory's customers regarding the sale and policy conversion. On January 1, 2020, all policies at issue in this case were rewritten as Clear Spring policies.

¶5 On December 27, 2022, the CSI filed a notice of proposed agency action alleging that Victory had illegally cancelled its policies and asserting that it could impose up to a $2.7 million fine. Victory requested a hearing and the case was assigned to a CSI Hearing Examiner. On March 16, 2023, after extensive discovery, the CSI moved for summary judgment on the question of whether Victory committed a violation. Victory filed its own motion for summary judgment on May 22, 2023. On May 23, 2023, the Hearing Examiner issued his Findings of Fact, Conclusions of Law, Order, and Recommended Decision on the Commissioner's Motion for Summary Judgment ("Hearing Examiner's Order"). The Hearing Examiner found that Victory had committed 165 violations of §§ 33-15-1103(1),- 1105, and -18-202(1), MCA, and that the CSI could impose a fine of up to $4,125,000 pursuant to § 33-1-317, MCA.

¶6 On June 1, 2023, the CSI issued an Order on Opportunity for Respondent to File Exceptions, Present Briefs, and Oral Argument. On June 30, 2023, Victory filed exceptions to the Hearing Examiner's Order with the CSI. The CSI delegated its authority to review the Hearing Examiner's Order to the Deputy Securities Commissioner, who held

3

an oral argument on Victory's exceptions. The CSI issued its final decision on August 11, 2023, in which it adopted the Hearing Examiner's Order and imposed a fine of $250,000, with $150,000 suspended, coming due only if Victory "commit[ted] further violations of the Insurance Code within one year."

¶7 On December 7, 2023, Victory petitioned the District Court for review of the CSI's final decision pursuant to § 2-4-702 of the Montana Administrative Procedure Act. In its petition, Victory made substantially the same arguments it now makes on appeal. The District Court rejected those arguments and affirmed the CSI's final decision.

## STANDARDS OF REVIEW

¶8 We review a district court order reviewing an agency action by employing the same standards that the district court used to review the agency decision. *McBroom v. Mont. Bd. of Pers. Appeals*, 2025 MT 64, ¶ 7, 421 Mont. 243, 566 P.3d 518 (citing *Watson v. Mont. Dep't of Fish, Wildlife & Parks*, 2023 MT 239, ¶ 12, 414 Mont. 217, 539 P.3d 1126). A district court reviews an agency's interpretations and applications of law to determine whether they are correct. *Watson*, ¶ 12; *see also* § 2-4-704(2)(a)(i)-(iv), MCA. A district court reviews an administrative agency's findings of fact to determine whether they are clearly erroneous in view of the reliable, probative, and substantial evidence in the record. *Watson*, ¶ 12 (citing § 2-4-704(2)(a)(v), MCA).[1]

_____

[1] Victory argues that we should review the Hearing Examiner's summary judgment determination for correctness, citing our decision in *Missoula Elec. Coop. v. Jon Cruson, Inc.*, 2016 MT 267, 385 Mont. 200, 383 P.3d 210. Because we review agency interpretations and applications of law for correctness in any case, and Victory only appeals the Hearing Examiner's conclusions of law, we need not consider in this case whether we may apply a standard of review to agency decisions other than those provided for in § 2-4-704(2)(a), MCA.

## DISCUSSION

¶9 *Issue 1: Whether the Hearing Examiner improperly granted summary judgment in favor of the CSI on the question of whether Victory violated Montana's insurance code.*

¶10 Victory argues the Hearing Examiner improperly granted summary judgment to the CSI on the question of whether it violated §§ 33-15-1103(1), -1105, and -18-202(1), MCA. Section 33-15-1103(1), MCA, provides that an insurer "may not cancel an insurance policy before either the expiration of the agreed term or 1 year from the effective date of the policy or renewal date, whichever is less" except in specific circumstances.

¶11 Victory argues that the Hearing Examiner erred when it granted summary judgment on the question of whether its actions on January 1, 2020, constituted "cancellations" for the purposes of §§ 33-15-1103(1) and -1105, MCA, because there were disputes of material fact regarding whether it assigned the existing insurance contracts. Victory's argument rests on the proposition that cancellations and assignments are mutually exclusive for purposes of §§ 33-15-1103(1) and -1105, MCA, which is ultimately a question of statutory interpretation.

¶12 We interpret a statute first by looking to its plain language. *Maier v. State*, 2021 MT 296, ¶ 8, 406 Mont. 280, 498 P.3d 755. We construe a statute by reading and interpreting the statute as a whole, "without isolating specific terms from the context in which they are used by the Legislature." *State v. Felde*, 2021 MT 1, ¶ 19, 402 Mont. 391, 478 P.3d 825. We will not interpret the statute further if the language is clear and unambiguous. *Maier*, ¶ 8. We look to legislative intent if the language is not clear and

5

unambiguous and give effect to the legislative will. *Mont. Sports Shooting Ass'n v. State*, 2008 MT 190, ¶ 11, 344 Mont. 1, 185 P.3d 1003. Statutory construction should not lead to absurd results if a reasonable interpretation can avoid it. *Maier*, ¶ 8. We must harmonize statutes relating to the same subject, as much as possible, giving effect to each. *Mont. Sports Shooting Ass'n*, ¶ 11.

¶13 Neither § 33-15-1103, MCA, nor the applicable definition provision, § 33-15-102, MCA, define "cancellation." Victory urges us to adopt a definition that cancellation is an event that creates a lapse in coverage for the insured, arguing that is the purpose of § 33-15-1103, MCA. Victory's interpretation of the purpose of § 33-15-1103, MCA, conflicts with the statute's stated purpose. Section 33-15-1101, MCA, entitled "Purpose – applicability," states that the purpose of Title 33, Chapter 15, is to:

> protect the public with regard to insurance transactions that involve cancellation, renewal, nonrenewal, or premium increases on contracts of property or casualty insurance by:
>
> (a) regulating the grounds for midterm cancellation of an insurance policy;
> (b) except as provided in 33-15-1108, prohibiting midterm increases in premiums;
> (c) increasing the opportunity for insureds to shop for replacement or substitute insurance;
> (d) reducing the opportunity for breach of contract, misrepresentation by omission or untimely disclosure, and unfair discrimination among insureds; and
> (e) increasing the opportunity for insurance producers to compete freely.

Read together, the Legislature's stated purpose for enacting § 33-15-1103, MCA, and its related provisions was to protect insurance customers' ability to choose between related

6

products without the pressure of unexpected changes and foster competition among insurance providers.

¶14 The context of § 33-15-1103, MCA, supports this market-based understanding of the Legislature's purpose. Section 33-15-1104, MCA, prohibits insurers from cancelling or altering the premiums on long-term or indefinite policies without extended notice to the insured, giving the insured more time to shop for a new policy in the event of an alteration or cancellation. Section 33-15-1105, MCA, prescribes the conditions under which an insurer can impose a renewal premium or refuse to renew a policy, but waives those prescriptions where an insured "has obtained insurance elsewhere." Section 33-15-1106, MCA, prohibits insurers from renewing a policy with less favorable terms without 45 days' notice to the insured. While each of these provisions would tend to decrease the likelihood that an insured would lose coverage, they go beyond that objective by requiring insurers to maintain a transparent marketplace in which insureds have ample time to field competing options and choose between them.

¶15 It is through this lens of fostering insurance-market competition that we must determine whether an assignment can constitute a cancellation for purposes of § 33-15-1103, MCA. Victory contends that the Clear Spring policies are materially identical to the policies in place on December 31, 2019. However, there is one material difference between the two sets of policies: the issuing insurer. An insured's ability to choose the insurer with whom they are contracting is at the very core of market competition and Montana law assumes that the parties to a contract "are in the best position to make

decisions in their own interest." *Zirkelbach Constr., Inc. v. DOWL, LLC*, 2017 MT 238, ¶ 13, 389 Mont. 8, 402 P.3d 1244.  It is not for the courts to determine whether an insured's selection of a particular insurer is better or worse than their previous insurer, only to give effect to that decision, particularly where the Legislature has expressed a clear intent to foster competitive selection in the insurance marketplace.  We, therefore, hold that an assignment can constitute a cancellation for the purposes of § 33-15-1103, MCA.  The Hearing Examiner did not err when he granted summary judgment on the issue of whether Victory violated §§ 33-15-1103 and -1105, MCA, regardless of whether there were disputes of fact as to whether Victory's actions constituted an assignment.  The Victory policies were terminated and replaced with Clear Spring policies.  Irrespective of whether that also may be considered an assignment, it constituted a cancellation covered by the requirements of § 33-15-1103, MCA.

¶16     Section 33-18-202(1), MCA, provides that an insurer may not make any statement which "misrepresents the benefits, advantages, conditions, or terms of any insurance policy."  Victory argues that the Hearing Examiner erred when he determined that Victory's December 31, 2019 email to its policy holders contained a misrepresentation. The Hearing Examiner determined, in part, that the email "made misrepresentations by failing to clearly explain that each Victory policy was terminated and rewritten by Clear Spring." Victory disputes that it was required to notify its policy holders that their policies were terminated, arguing again that it assigned rather than terminated the policies.  Having decided that the Hearing Examiner did not err in his conclusion that the policies were

terminated, it follows that the Hearing Examiner did not err by holding that summary judgment was proper as to Victory's violation of § 33-18-202(1), MCA.

¶17 *Issue 2: Whether the CSI violated Victory's due process rights when it imposed the fine.*

¶18 On appeal, Victory advances four arguments that the CSI's imposition of a $250,000 fine violated its due process rights. First, Victory argues that it did not have sufficient notice and opportunity to address the appropriateness of the fine because "the first time Victory had an opportunity to discuss an appropriate fine was after the evidentiary record closed." Article II, Section 17, of the Montana Constitution provides that "no person shall be deprived of life, liberty, or property without due process of law." We have previously stated that "due process generally requires notice of a proposed action which could result in depriving a person of a property interest and the opportunity to be heard regarding that action." *Geil v. Missoula Irrigation Dist.*, 2002 MT 269, ¶ 53, 312 Mont. 320, 59 P.3d 398 (quoting *Pickens v. Shelton-Thompson*, 2000 MT 131, ¶ 13, 300 Mont. 16, 3 P.3d 603).

¶19 Victory asserts that the fine imposition process failed to provide it with an "opportunity to be heard" because it was not able to introduce new evidence at oral argument before the CSI Deputy Commissioner. But Victory was on notice as of the December 27, 2022 notice of proposed agency action that the CSI could impose fines totaling up to $2.7 million. In any of its filings before the Hearing Examiner, Victory could have presented evidence it deemed relevant to the calculation of a potential fine. Having introduced that evidence before the Hearing Examiner, it would then have been entitled to refer to that evidence at oral argument before the CSI. Victory had every opportunity to

9

introduce evidence which would then be part of the record that could be referenced at oral argument before the CSI Deputy Commissioner. That Victory failed to take advantage of those opportunities does not constitute a denial of due process.

¶20 Victory next argues that the CSI failed to comply with § 2-4-621, MCA, because it imposed a fine without a recommended fine from the Hearing Examiner. Victory does not explain how an alleged failure to follow a procedural provision necessarily results in a due process violation. Nor does it cite any case law in support of that argument. Victory cites *Munn v. Mont. Bd. of Med. Examiners*, 2005 MT 303, 329 Mont. 401, 124 P.3d 1123, for the ostensible proposition that a fine may only be imposed after a hearing examiner has made a recommendation. But *Munn* did not involve any due process violation, nor did it even involve the failure of a hearing examiner to recommend a fine. In *Munn* we held that a final agency decision imposing a sanction is not arbitrary and capricious when that sanction is more severe than that recommended by a hearing examiner. *See Munn*, ¶¶ 29-30. We fail to see how *Munn* supports Victory's due process argument and Victory provides us with no substantive argument in support of its position. "As we have stated on numerous occasions, . . . we are not obligated to develop arguments on behalf of parties to an appeal, nor are we to guess a party's precise position, or develop legal analysis that may lend support to his position." *Est. of Harris v. Reilly*, 2025 MT 126, ¶ 16, 422 Mont. 383, 570 P.3d 552. Because Victory does not develop its argument that an alleged violation of § 2-4-621, MCA, gives rise to a due process violation, we decline to consider it.

10

¶21 Victory argues next that any fine imposed by the CSI would violate due process because § 33-1-317, MCA, does not place sufficient safeguards around the CSI's exercise of its discretion. Section 33-1-317, MCA, provides that "[t]he commissioner may, after having conducted a hearing pursuant to 33-1-701, impose a fine not to exceed the sum of $25,000 upon a person found to have violated a provision of this code or regulation promulgated by the commissioner." Victory argues that the $25,000-per-violation cap is an insufficient limitation on the CSI's discretion. While Victory stops short of asking us to declare § 33-1-317, MCA, unconstitutional, its argument amounts to an assertion that the statute is an unconstitutional delegation of legislative power to an agency.

¶22 The Legislature "may delegate its legislative powers to an administrative body so long as it sets forth a policy, rule, or standard for guidance and does not vest them with an arbitrary and uncontrolled discretion." *State v. Akhmedli*, 2023 MT 120, ¶ 8, 412 Mont. 538, 531 P.3d 562 (quoting *State v. Spady*, 2015 MT 218, ¶ 19, 380 Mont. 179, 354 P.3d 590). The test we have adopted to determine whether a statute's provisions are sufficiently "clear and definite" to permit legislative delegation is whether "(1) the policy behind the statute is present; (2) the rationale behind the statute, even if implicit, is evident; and (3) the statute provides a standard or guide for the proper delegation of legislative power." *Akhmedli*, ¶ 9 (citing *The Duck Inn v. Mont. State University-Northern*, 285 Mont. 519, 525, 949 P.2d 1179, 1183 (1997)).

¶23 In *Spady*, we considered a statute that permitted the Attorney General to adopt rules providing for "testing fees for the [24/7 Sobriety Program], including the collection of fees

11

to pay the cost of installation, monitoring, and deactivation of any testing device." *Spady*, ¶ 20 (quoting § 44-4-1204(2), MCA). We determined that the policy behind the statute was present in the clear direction to fund and maintain the 24/7 Sobriety Program, the rationale behind the statute was implicitly to collect only those fees actually necessary to pay for the administration of the program (as opposed to collecting a general tax that might prove too much or too little based on participation), and the statute provided a guide in the form of the limitation on the fees to only those necessary to pay for program costs. *See Spady*, ¶ 20. We, therefore, determined that the Legislature's delegation to the Attorney General was permissible in spite of its delegation of the power to impose criminal sanctions for failure to pay the assessed fees. *See Spady*, ¶ 20.

¶24　The policy of the Montana insurance code, as administered by the CSI, as stated in a neighboring provision, is "to ensure that the interests of insurance consumers are protected." Section 33-1-311(3), MCA. As with any fine, the rationale behind the delegation in § 33-1-317, MCA, is, implicitly, to deter future violations of the insurance code by imposing a sufficient penalty. The standard for the exercise of the CSI's discretion is more stringent than those in *Spady*. Unlike in *Spady*, where the Attorney General had the discretion to determine what costs were necessary to maintain the program, the CSI may only impose fines if it determines that there has been a violation of the insurance code. Also unlike in *Spady*, where the Attorney General was empowered to determine the amount necessary to fund the program, the CSI's fines are capped at $25,000 per offense. Because the Legislature's delegation of authority to the CSI is at least as clear and definite as the

one we approved in *Spady*, we conclude that § 33-1-317, MCA, is not an improper delegation of legislative authority.

¶25 Finally, Victory argues that the CSI's fine was arbitrary and capricious because "the dispute here centers on a difference in legal interpretation." Victory does not cite any precedent or statutory authority in support of this contention in either its opening or reply briefs. As noted above, we are not obligated to develop a party's arguments for them and again decline to do so. *Est. of Harris*, ¶ 16.

¶26 *Issue 3: Whether Victory was entitled to a jury trial.*

¶27 Victory argues that it was entitled to a jury trial regarding its violations, citing the United States Supreme Court's recent decision in *SEC v. Jarkesy*, 603 U.S. 109, 144 S. Ct. 2117 (2024). *Jarkesy* concerned the right to a civil jury trial contained in the Seventh Amendment to the United States Constitution, which Victory concedes has never been incorporated to the states. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 432, 116 S. Ct. 2211, 2222 (1996). Victory argues, though, that because we have previously held that Montana's right to a jury trial, as enshrined in Article II, Section 26, of the Montana Constitution, is "the same as that guaranteed by the Seventh Amendment," *Jarkesy* should apply with equal force here. *Romero v. J & J Tire*, 238 Mont. 146, 151, 777 P.2d 292, 295 (1989).

¶28 We need not decide whether the reasoning of *Jarkesy* applies to Article II, Section 26's jury trial right because there is a wholly independent and adequate state ground on which to resolve this case. "It is well-established that although Article II, Section 26 of

13

Montana's Constitution provides that '[t]he right of trial by jury is secured to all and shall remain inviolate,' the right to jury trial encompassed by § 26" is limited to the context "in which the right was enjoyed when the constitution was adopted." *State v. Chilinski*, 2016 MT 280, ¶ 8, 385 Mont. 249, 383 P.3d 236. "Montana's 1889 Constitution codified and preserved all existing common law rights to a jury trial. Those rights were then re-codified and protected in Article II, Section 26 of Montana's 1972 Constitution." *Chilinski*, ¶ 8. An historical understanding of the scope of the right to a jury trial is informative of our interpretation of the scope of Article II, Section 26. *See Supola v. Mont. DOJ, Drivers License Bureau*, 278 Mont. 421, 424-25, 925 P.2d 480, 482 (1996).

¶29 Section 8-3-249, CSM (1887), provided that in a civil case "[a]n issue of law must be tried by the court, unless referred upon consent." Section 8-3-250, CSM (1887), provided that "[i]n all cases where there are issues of both law and fact, the issues of law must be first disposed of, and in all cases issues of fact must be tried by a jury." Contemporary caselaw confirms that Montana law at the time of the adoption of the 1889 Constitution recognized a procedure by which trial courts could resolve pure questions of law without submitting the case to a jury. *See Emerson v. Eldorado Ditch Co.*, 18 Mont. 247, 257, 44 P. 969, 972 (1896) ("Where there is no conflict in the evidence, and the court directs a verdict, and decides the case either for plaintiff or defendant, it is equivalent to a judgment of nonsuit."); *Helena Nat'l Bank v. Rocky Mountain Tel. Co.*, 20 Mont. 379, 393, 51 P. 829, 834 (1898) ("Where, in a civil action, the facts are admitted or undisputed, or

14

where the evidence is 'all in one direction,' the only questions for decisions are those of law.").

¶30 Montana law continued to recognize the ability of trial courts to resolve civil cases lacking a dispute of material fact at the time of the adoption of the 1972 Montana Constitution. In *Home Ins. Co. v. Pinski Bros.*, 160 Mont. 219, 226, 500 P.2d 945, 949 (1972), we affirmed a district court's grant of summary judgment against an insurance company where its claim of subrogation was resolvable on the purely legal ground that "no subrogation exists against the insured or coinsured whose negligence caused the loss." In 1973, the year after the adoption, we affirmed a district court's grant of summary judgment against an insurance company because the case was resolvable on a purely legal question of contract interpretation. *Stonewall Ins. Co. v. West*, 163 Mont. 12, 15, 514 P.2d 764, 765 (1973).

¶31 This historical understanding that a court, rather than a jury, could render final judgment in a case where there was no material dispute of fact comports with our modern understanding of summary judgment. M. R. Civ. P. 56(c)(3) provides that a court may resolve a case without submitting it to a jury "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Resolving a matter by summary judgment does not conflict with a party's entitlement to a jury trial because the jury is the "ultimate trier of *fact*," *State ex rel. Indus. Indem. Co. v. Dist. Ct.*, 169 Mont. 10, 14, 544 P.2d 438, 440 (1975) (emphasis added). Cases susceptible to summary disposition

15

have no material facts in dispute. The Hearing Examiner in this case resolved the issues of Victory's violations after both the CSI *and Victory* moved for summary judgment. Summary judgment was proper because there were no material disputes of fact left in the case. Regardless of whether Victory might have been otherwise entitled to a jury trial, it was not deprived of that right when the Hearing Examiner properly used summary judgment to resolve the case.

## CONCLUSION

¶32 The District Court's August 27, 2024 Judicial Review Petition Order is affirmed.


/S/ JAMES JEREMIAH SHEA


We Concur:

/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ JIM RICE